IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-40031-HLT |
| ) | |
| CHRISTOPHER LEE COWAN, SR., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

## **MEMORANDUM AND ORDER**

Defendant has been charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This matter comes before the Court on defendant's motion to suppress evidence obtained upon his arrest (Doc. # 22). On October 11, 2019, the Court conducted a hearing on the motion, at which it received evidence and heard additional argument. The parties also submitted post-hearing briefs, which the Court has considered. For the reasons set forth below, the Court **grants** the motion, and all such evidence shall be suppressed. In short, this is a case in which an officer acted on a hunch that proved incorrect, but which led to the discovery of incriminating evidence of another crime; but the officer did not have a legal basis to act on his hunch as he did.[1]

_____

[1] This case was assigned to the Hon. Holly L. Teeter. Because of a scheduling conflict, the undersigned agreed to conduct the hearing and rule on the motion (with the consent of both parties).

## I.      <u>Facts</u>

Officer Jason Oyler of the Topeka Police Department was the only witness at the hearing, and the timeline of relevant events comes from his testimony and the record of the information that was relayed to Officer Oyler by dispatch during the events.  These facts are essentially undisputed.

On February 3, 2019, at approximately 2:51 p.m., Officer Oyler was told that a robbery had occurred five minutes before at 904 SW Lincoln in Topeka, Kansas.  Over the next 13 minutes, Officer Oyler received the following information about the robbery and its perpetrator.  The perpetrator had used a gun and took a cell phone and wallet from the victim.  The perpetrator was a black male, with a medium build, five-feet-ten or just under six-feet tall.  He sounded as if his age was in the late teens or early twenties.  He wore a black hoodie (hooded sweatshirt) and possibly wore black pants.  He was last seen leaving the area of the robbery westbound on foot, toward the intersection of Lincoln and 9th Street.

At 3:04 p.m., approximately 18 minutes after the robbery, Officer Oyler saw defendant riding a bicycle.  Officer Oyler was in uniform and driving a marked police vehicle, and he was in the process of setting up a perimeter several blocks wide around the scene of the robbery.  Officer Oyler was driving northbound on Fillmore, north of 8th Street and approaching 7th Street, and he saw defendant ride eastbound on 9th Street and turn south onto Fillmore's eastern sidewalk.  That intersection of Fillmore and 7th, where Officer Oyler first saw defendant, was two blocks north and three blocks east of the perpetrator's last reported location; Officer Oyler testified that it would be about a nine-minute walk between the two locations.  After the turn onto Fillmore, defendant passed

Officer Oyler's vehicle, and Officer Oyler was able to observe defendant. Office Oyler observed that defendant was a black male, who appeared to be between five-feet-ten and six feet tall; and defendant wore a dark gray hoodie, dark gray sweatpants, and gloves. No one else in the area was close to a match for the perpetrator as described, and no other officer had reported contact with a suspect, and Officer Oyler decided based on his appearance that defendant was a possible suspect for the robbery. Officer Oyler testified that although he had been given a description of a person wearing a black hoodie and possibly black pants, defendant's dark gray hoodie and pants were close enough, as it would not be unusual in his experience for a victim to describe dark gray clothing as black. Neither the clothing nor any pictures thereof were introduced into evidence, however, and thus the Court was unable to judge the degree to which the color of defendant's clothes could have been mistaken for black.

After passing defendant and deciding that he was a suspect, Officer Oyler executed a u-turn and began to follow defendant. The officer turned on his emergency lights and chirped his siren to indicate to defendant that he should stop. Defendant looked back, which afforded Officer Oyler a look at defendant's face. Defendant then pedaled away faster, and Officer Oyler continued his pursuit in his vehicle. Defendant rode westbound down an alley between 7th and 8th Streets, then southbound down another alley, then westbound on 8th Street on the sidewalk. When defendant attempted to turn north onto Clay, he lost control, and the bicycle slid out from under him. Officer Oyler was still following within 50 feet behind defendant, with his lights still activated and still occasionally chirping his siren.

After defendant crashed on the bicycle, Officer Oyler got out of his vehicle and ran toward defendant, making eye contact.  Defendant ran west across Clay and up an embankment to the sidewalk.  Defendant put both hands in front of him toward his waistband, and Officer Oyler believed that defendant was going for a firearm.  After a brief moment, however, defendant start to fall forward, and a cell phone fell out from in front of defendant.  Officer Oyler ran up and dropped his weight on defendant; he was pinning defendant's arms and giving commands when other officers arrived and helped Officer Oyler place defendant in handcuffs (within seconds of defendant's having been subdued). Once defendant was in cuffs and was being stood up, defendant informed officers (unsolicited) that he had a pistol, which officers then found on his person.  Officers also found a case with a pipe and a substance that field-tested positive for methamphetamine. Defendant was in custody within approximately two minutes of the time when Officer Oyler first observed him and began his pursuit.

Officer Oyler testified that he had the opportunity to look at defendant's face multiple times during the encounter before he subdued defendant, and he did not testify that defendant's hood was up or that he was unable to observe defendant's face for some other reason.  He further testified that he simply did not consider defendant's age, despite the description of the perpetrator as a person in his late teens or early twenties, in deciding that defendant matched the description given and was a suspect for the robbery; rather, he relied solely on defendant's height, weight, and clothing.  Officer Oyler conceded that defendant looked the same at the hearing as he did on the day of the arrest.  He further

conceded that defendant, who was 47 years old at the time of the arrest, is balding and does not look like a man in his early twenties.

The Topeka Police Department's written policy requires an officer to activate his body camera during all law enforcement-related encounters, including traffic stops, arrests, pursuits, and adversarial encounters with the public, and including while operating a vehicle with lights and siren activated. Officer Oyler conceded that his pursuit and arrest of defendant fell within the scope of the policy's requirement for activation of his body cam. The only exception in the policy is for times in which activation would be unsafe, impossible, or impractical. Despite this policy, Officer Oyler conceded that he failed to activate his body cam at any time during his encounter with defendant before the arrest. He testified that as he was driving with one hand in pursuit while activating the lights and siren with the other, he had no time to activate the camera by tapping on the button on his uniform, and that he was focused instead on defendant; and that he exited his vehicle as fast as he could once defendant crashed the bicycle. Officer Oyler also did not document his failure to activate the body cam in the manner required by the policy.

## II.    <u>Analysis</u>

Defendant seeks to suppress evidence obtained as a result of a seizure in violation of the Fourth Amendment. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963) (exclusionary rule). The Government does not dispute that if defendant was unlawfully seized, the evidence obtained upon his arrest should be excluded. Accordingly, the Court considers only whether defendant was seized in violation of the Fourth Amendment.

In his initial motion, defendant argued that Officer Oyler lacked the requisite reasonable suspicion to conduct an investigative (*Terry*) stop when he was pursuing defendant. As defendant's counsel conceded at the hearing, however, an officer seizes a person for purposes of the Fourth Amendment only if he restrains the movement of the person by physical force or if the person submits to the assertion of the officer's authority. *See United States v. Martin*, 613 F.3d 1295, 1300 (10th Cir. 2010) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). In this case, defendant did not stop for the officer, and Officer Oyler did not physically restrain him until defendant fell after running up the embankment. Thus, no seizure took place until that restraint.

When Officer Oyler did restrain him, defendant was handcuffed within moments. The Government does not dispute that by that time defendant effectively had been arrested. *See Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007) (use of handcuffs and other forceful techniques exceeds the scope of an investigative detention and enters the realm of an arrest). An arrest must be supported by probable cause, which is a more demanding standard than the reasonable suspicion required to support an investigative stop. *See United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). The Tenth Circuit has defined probable cause as follows:

> Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Although probable cause does not require facts sufficient for a finding of guilt, it does require more than mere suspicion. . . .
>
> Probable cause is measured against an objective standard. The subjective belief of an individual officer as to whether there was probable

cause for making an arrest is not dispositive.  Thus, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer.

*See id.* at 896-97 (citations and internal quotations omitted).  No single factor is determinative, and the circumstances must be viewed in their totality.  *See id.* at 897.  In determining whether probable cause to arrest existed, the Court must look not only to the facts supporting probable cause, but also to those that militate against it.  *See id.*  The Government bears the burden of establishing the probable cause necessary to support the arrest.  *See id.* at 902.

The Court first considers whether Officer Oyler had probable cause to arrest defendant for the robbery.  With respect to this inquiry, the parties dispute the extent to which the Court should consider the fact of defendant's flight from the officer (first by failing to stop on his bicycle, then by running away after the crash).  First, flight alone is not enough to establish reasonable suspicion for an investigative stop; the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) (citing cases).  In *Illinois v.* Wardlow, 528 U.S. 119 (2000), however, the Supreme Court stated that unprovoked flight goes beyond a mere refusal to cooperate, and it held in that case that unprovoked flight plus other factors provided reasonable suspicion to stop the defendant.  *See id.* at 124-25.

Of course, probable cause is required here, not reasonable suspicion.  In a footnote in *Kolender v. Lawson*, 461 U.S. 352 (1983), the Supreme Court stated that some reactions

7

to a properly limited *Terry* stop, such as flight, "may often provide the necessary information, in addition to that the officers already possess, to constitute probable cause." *See id.* at 366 n.4.  The Supreme Court nonetheless issued the following warning:  "A court confronted with such a claim, however, would have to evaluate it carefully to make certain that the person arrested was not being penalized for the exercise of his right to refuse to answer."  *See id.*  In *United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981), the D.C. Circuit held that although flight alone is not sufficient to provide probable cause because it is not a "reliable indicator of guilt without other circumstances to make its import less ambiguous," flight may be considered with other evidence to establish probable cause.  *See id.* at 1151-52 (internal quotation omitted).  Similarly, in *United States v. Navedo*, 694 F.3d 463 (3d Cir. 2012), the Third Circuit held that flight without more cannot elevate reasonable suspicion into probable cause to arrest, as a person is free to avoid police by leaving the scene, and "the rate of acceleration of the person's [gait] as s/he leaves . . . is far too ephemeral a gauge to support a finding of probable cause;" but that unprovoked flight can be considered with other trustworthy information to provide probable cause.  *See id.* at 474.  In *United States v. Slipka*, 735 F.2d 1064 (8th Cir. 1984), the Eighth Circuit held that probable cause was supported by the fact of flight coupled with other evidence. *See id.* at 1066.  Thus, based on this authority, the Court concludes that probable cause may not be based in this case solely on the fact of defendant's flight from Officer Oyler, but his flight may be considered as a relevant factor that may combine with other facts to provide probable cause.

The Court then considers whether Officer Oyler, at the time of his arrest of defendant, had probable cause based on a reasonable belief that defendant had committed the robbery. Although there are a few facts that weigh in favor of probable cause here, the Court concludes that those facts are outweighed by facts that militate against a finding of probable cause. First, it is true that defendant was first observed within five blocks of the robbery, in a place that he could have reached in that amount of time since the robbery. On the other hand, it is likely that the perpetrator would have tried to leave the area quickly, and defendant was still in the area (a nine-minute walk from the robbery location) 18 minutes after the crime. Moreover, the officer observed defendant turning south, meaning that defendant was heading back *toward* the robbery scene and not away from it; and defendant was on a bicycle, while the report was that the perpetrator left the robbery scene on foot. Second, it is true that Officer Oyler believed that defendant matched the description of the perpetrator because he was a black male wearing a dark-colored hoodie and pants. On the other hand, it was not a complete match because the perpetrator's clothes were described as black, while defendant's clothes were observed to be dark gray. Third, Officer Oyler testified that defendant matched the perpetrator's reported height and weight; but the fact that the height and weight were average for a man means that such a match is not necessarily remarkable (and the Court wonders how well a reasonable officer can determine the height of a person riding a bicycle).

Fourth, defendant did not match the perpetrator's reported age, and that fact weighs against a finding of probable cause. The perpetrator was described to officers as being in his late teens or early twenties, while defendant was a balding 47-year-old who did not

9

look like a person that young (as conceded by Officer Oyler).  Officer Oyler did not specifically testify that defendant's hood was down, but he did testify that he saw defendant's face on multiple occasions during his pursuit, and he did not state that his view of defendant's face was restricted in any way.  (Indeed, if defendant's hood had obscured his face, it might have been difficult for Officer Oyler to determine that he was a black man.)  Officer Oyler did not testify that he could not determine defendant's age; rather, he testified that he simply didn't consider that part of the description of the perpetrator, relying instead on the descriptors about the perpetrator's race and clothing.  The officer, however, had multiple opportunities to note that defendant did *not* in fact match the description of the perpetrator because of his age, and that fact weighs strongly against a finding of probable cause.

Fifth, defendant did flee from the officer, and that action could provide at least some evidence of guilt.  The Court notes, however, that this was not the type of "unprovoked flight" that the Supreme Court considered in *Wardlow*, in which the defendant had run upon seeing police before any officer approached him specifically.  *See Wardlow*, 528 U.S. at 121, 124-25.  Rather, in this case defendant fled only after Officer Oyler indicated that he wished to detain defendant, and such a "provoked" flight therefore weighs less in favor of probable cause than an "unprovoked" flight would.[2]  In addition, in accordance with the

---

[2] As one court has noted, a reasonable interpretation of *Wardlow* is that an unprovoked flight includes situations in which police did not converge on, surround, or even approach the defendant before he ran.  *See United States v. Jeter*, 721 F.3d 746, 753-54 (6th Cir. 2013); *see also United States v. Rodella*, 804 F.3d 1317, 1325 (10th Cir. 2015) (citing *Jeter*'s review of the issue of provoked flight).  Under that interpretation, because

Supreme Court's warning in *Kolender*, the Court must be careful not to give too much weight to this factor, lest defendant be punished for exercising his right not to cooperate.

Thus, in this case, a reasonable officer is left only with that flight and the fact that a black male wearing a hoodie (a very common garment) that was close in color was found in the area of a crime.[3]  In considering the totality of the circumstances, the Court concludes that those factors are outweighed by facts that suggested that defendant was *not* the perpetrator: the difference in the color of the clothing; the absence of any report about the perpetrator riding a bicycle; the fact that defendant was still in the area so many minutes after the robbery, and was heading back in the direction of the crime scene; and the reasonably observable fact that defendant was not even close to the right age and thus did *not* match the description of the perpetrator.  Because defendant did not in fact match the description of the perpetrator other than with respect to his race and unremarkable clothing, a finding of probable cause here would effectively be based solely on the fact of defendant's flight, and as discussed above, that fact cannot support probable cause by itself.

---

defendant here fled only after the officer singled him out for attention, his flight was provoked, and more would be required to reach probable cause. *See Jeter*, 721 F.3d at 754.

[3] It is true that dispatch reported that the perpetrator took the victim's cell phone and that the officer observed defendant drop a cell phone.  Given the ubiquity of such devices, however, the Court concludes that the presence of the phone did not make it more likely that defendant was the perpetrator of the robbery.  Moreover, Officer Oyler did not testify that he relied on the cell phone in deciding that defendant was a suspect for the robbery; nor did counsel for Government reference the cell phone in arguing that probable cause existed here.

Accordingly, the Court concludes that the Government has not met its burden to show probable cause to arrest defendant for the robbery.[4]

The Government also argues that Officer Oyler had probable cause to arrest defendant for obstructing a law enforcement officer in violation of K.S.A. § 21-5904(a)(3), which criminalizes the knowing obstruction of an officer in the discharge of official duty. *See id.* The use of actual force is not always a necessary element of this offense, but there must be "some actual overt act of obstruction." *See State v. Parker*, 236 Kan. 353, 360 (1984) (considering predecessor statute to Section 21-5904(a)(3)). "To obstruct means to interpose obstacles or impediments, to hinder, impede, or in any manner intrude or prevent." *See id.* at 361. "[T]he action of the defendant charged with obstruction of official duty must have substantially hindered or increased the burden of the officer in carrying out his official duty." *See id.* at 364; *see also State v. Everest*, 45 Kan. App. 2d 923, 929 (2011) (noting that Kansas courts have consistently required proof of this additional element set out by the supreme court in *Parker*).

The Government argues that defendant committed the crime of obstruction when he fled from Officer Oyler. In at least two cases, a Kansas appellate court has upheld a conviction for obstruction based on flight, but in each case, the defendant fled after an attempt to place him under arrest. *See State v. Gasser*, 223 Kan. 24, 30-31 (1977) (conviction challenged on other grounds); *State v. Logan*, 8 Kan. App. 2d 232 (1982).

---

[4] In light of this conclusion, the Court need not rule on defendant's request, based on Officer Oyler's failure to activate his body cam as required by his department's policy, for an inference that a recording would have shown facts detrimental to the Government concerning defendant's alleged flight from the officer.

Thus, those cases are easily distinguished from the present case, in which the defendant had not yet been detained.

The Government also relies on an unpublished case, *State v. Jackson*, 2017 WL 4081263 (Kan. Ct. App. Sept. 15, 2017) (unpub. op.), *rev. denied* (Kan. Apr. 26, 2018), in which the court of appeals stated that "[a]vailable caselaw demonstrates that a defendant's failure to comply with a lawful order provides probable cause for an arrest on the charge of interference with law enforcement." *See id.* at *4. Of course, this unpublished case has no precedential value, and the statement is essentially dictum, as the conduct in that case (including shooting at officers) went well beyond mere noncompliance. Moreover, in the only case cited to support that statement, the Tenth Circuit did not conduct any analysis under the statute or cite any authority in stating that the defendant's failure to comply with a lawful order to exit a car gave an officer probable cause to arrest for this offense. *See United States v. Mosley*, 743 F.3d 1317, 1330-31 (10th Cir. 2014).

Nevertheless, the Court will assume for purposes of this motion that a defendant's refusal to obey a lawful order by an officer in these circumstances could support a conviction for obstruction under this Kansas statute. In this case, Officer Oyler did not give any verbal command to defendant. He did, however, come up behind defendant in a police vehicle with the emergency lights activated and the siren intermittently chirping, and Officer Oyler testified that defendant looked back at him at that time. A reasonable person in defendant's circumstances likely would have interpreted that action as an order to stop (as Officer Oyler intended the action to be interpreted, according to his testimony), and defendant did not comply with that order.

13

The order, however, must have been a lawful one, which means in this case that the officer must have had a reasonable suspicion of criminal activity to justify an investigative stop. Otherwise, defendant would be punished (by a conviction for obstruction) effectively for failing to allow himself to be seized without a valid basis under the Fourth Amendment. Thus, the Court must consider whether, at the time defendant began his flight, Officer Oyler had a reasonable suspicion that defendant had committed the robbery. *See Wardlow*, 528 U.S. at 123 (investigative stop requires a reasonable, articulable suspicion that criminal activity is afoot).

The Court concludes that at the time he began to pursue defendant, Officer Oyler did not have a reasonable suspicion that defendant was the perpetrator described by dispatch, for the same reasons set forth above with respect to the lack of probable cause. Prior to defendant's flight, the officer essentially knew only that a black male was in the area wearing a dark gray hoodie, while the perpetrator was a black male wearing a black hoodie. Moreover, those meager facts are easily outweighed by the other facts suggesting that defendant was not the perpetrator (described above), including the fact that defendant's observable age meant that he did *not* match the description of the perpetrator that the officer had. At most, the officer had a hunch or guessed that defendant might have been the person who committed the robbery, and a mere hunch or guess is not sufficient to support an investigative stop. *See Navarette v. California*, 572 U.S. 393, 397 (2014) (mere hunch does not create reasonable suspicion) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

Because Officer Oyler did not have a reasonable suspicion that defendant was engaged in criminal activity, he was not justified in ordering defendant to stop. Therefore,

14

defendant did not fail to comply with a lawful order, and officers did not have probable cause to arrest defendant for obstruction of a law enforcement official.[5]

Accordingly, the Government has failed to meet its burden to show that officers had probable cause to arrest defendant, either for the robbery or for obstruction. Evidence obtained as a direct result of the arrest must therefore be suppressed, and the Court thus grants defendant's motion.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion to suppress (Doc. # 22) is hereby **granted**.

IT IS SO ORDERED.

Dated this 12th day of November, 2019, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[5] In light of this ruling, the Court need not consider whether defendant's flight substantially hindered Officer Oyler in carrying out his duty.